# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **DORA LEE MARTEL,** | : |
| **Plaintiff,** | : |
| | : |
| **v.** | :          **NO. 3:09CV1412 (DJS)** |
| | : |
| **NEW ENGLAND HOME CARE, INC.,** | : |
| **Defendant.** | : |

## MEMORANDUM OF DECISION AND ORDER

On September 8, 2009, the plaintiff Dora Lee Martel ("Martel") filed this action against

the defendant, New England Home Care, Inc. ("NEHC"), alleging employment-related race

discrimination and retaliation for prior complaints of unlawful discrimination in violation of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and the

Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §§ 46a-60(a), *et seq.* ("CFEPA").

Currently pending before the Court is the defendant's motion for summary judgment (doc. # 21).

For the reasons set forth herein, the defendant's motion is **GRANTED**.

## I. FACTS

Martel is a Caucasian female and a registered nurse with over twenty years of nursing

experience. NEHC is a health care agency that provides in-home nursing services in the State of

Connecticut. The defendant employs approximately 900 full and part-time employees, of whom

approximately 65-70 percent are Caucasian.

In 1988, Martel received her practical nurse certificate in Canada and began working at

Providence Continuing Care Center, Mental Health Services, where she remained employed for

almost seventeen years. In 2003 she obtained her Registered Nurse Diploma. In 2006 she moved

from Canada to Connecticut to work at Patient Care, Inc. Her duties and responsibilities at

Patient Care, Inc. included making plans of care according to patients' psychiatric and medical needs, getting physician approval for those plans, implementing the plans, and doing follow-up reporting to insure that the plans were working.

During the summer of 2007 Martel met with NEHC's branch director, Lisa Knapp ("Knapp"), and director of human resources, John Oronzo ("Oronzo"), at a job fair in Middletown, Connecticut. Oronzo and Knapp, both Caucasian, encouraged Martel to apply for a position with NEHC. In late August 2007 the plaintiff interviewed with Elizabeth Rodriquez ("Rodriguez"), assistant director of NEHC's behavior health division, who is Hispanic. Rodriquez, with the approval of her supervisor Knapp, decided to hire Martel as a primary care registered nurse. On September 10, 2007, the plaintiff began working in NEHC's main office located in Cromwell, Connecticut. She was employed as a primary care registered nurse at NEHC for fifteen months until her termination on December 12, 2008.

In January 2008 Rodriquez allowed Martel to leave on short notice for an unscheduled week-long trip to Canada so that she could care for her young granddaughter while her daughter was sent to a treatment center. Rodriguez said that she would take care of finding coverage for all of Martel's patients during her absence. Later that year, in the summer of 2008, Rodriquez agreed to the plaintiff's request for additional time off following her surgery and again arranged for coverage for the plaintiff's patients.

Kimberly Nystrom ("Nystrom"), the president of NEHC, required nurses to attend an in-house training session on March 25, 2008, regarding NEHC's policies on pre-pouring medications. "Pre-pouring" refers to the dispensing of medication before the dosage is to be administered.  Because Martel and two other nurses were unable to attend the scheduled session, Nystrom met with those three nurses on March 31, 2008, and personally provided the training.

2

NEHC policy permits the pre-pouring of medications in situations where: (1) a current physician's order documented in the patient's chart authorizes pre-pouring, and (2) the patient is capable of taking such medication either by him or herself or with cuing or prompting from staff. Nurses are not allowed, however, to pre-pour any medications that they plan to administer at a subsequent visit. The State of Connecticut, acting through the Department of Social Services, will not provide reimbursement for a full visit if the medication is pre-poured for nurse convenience.

On May 27, 2008, Martel complained to her supervisor at the time, Rodriquez, about an African American per diem nurse, Olive Gilling ("Gilling"). Martel told Rodriquez that Gilling had taken a patient's empty bottle of Klonopin to the pharmacy to be refilled, a role outside of her job duties. Rodriquez met with Gilling and determined not to take disciplinary action against her as the patient had suffered no adverse effect, no policy had been violated, and Gilling was a new employee with no prior experience. Martel contends that after she lodged a complaint about Gilling, Rodriquez retaliated against her by treating her differently, in a "hostile" manner, and refusing to address her caseload issues. Specifically, she alleges that Rodriquez made it difficult for her to schedule additional per diem visits with other clients when her caseload was low, that she was not allowed to transfer a client who spoke only Spanish, and that at one point her caseload was unmanageably high. Furthermore, the plaintiff asserts that Rodriquez gave her daughter, a licensed practical nurse who was not allowed to case manage, preferential home visits, and that Cecilia Acosta ("Acosta"), supervisor of Behavior Health, who is Hispanic, facilitated these visits.

On July 11, 2008, Rodriquez met with Martel to review her written performance appraisal for the six-month period of September 10, 2007 to March 10, 2008. Rodriquez's

evaluation of the plaintiff's performance indicated a score of satisfactory or excellent in every rated category. The assessment stated that overall Martel had provided adequate care to her patients, demonstrated good communication with providers in the community, and was a good team player. The assessment also noted that Martel "needs to communicate with her peers in a professional way consistently." (Doc. # 21-3, at 26, p. 95: 18-20).  According to Martel, the comment regarding her professional communication was based on a statement she had made to an NEHC scheduler, a female Caucasian, that she was on vacation and it was not her job to schedule nurses to see clients for evening visits. Martel believes that including such a comment could be racially motivated, as she did not expect to see it on her assessment. Additionally, the performance appraisal states that Martel took extra time off after an approved vacation and that such an event should not be repeated. The plaintiff asserts that this comment could be based on race as it was an inaccurate statement. Finally, the evaluation lists four goals for Martel, including: more consistent staff meeting attendance, working on documentation issues, consistent timely submission of paperwork, and timely synchronization of medical records. Martel acknowledged at her deposition that all of these were good goals for the next performance period.

At her deposition Martel identified the evidence she is relying upon in support of her discrimination claim as her own personal observations of a difference between the way she was treated and the way non-Caucasian nurses were treated. According to Martel, she received unfair comments on her evaluation, while non-Caucasian nurses, who had acted inappropriately, were still employed at NEHC. The plaintiff admits that she has never had the opportunity to review non-Caucasian nurses' performance appraisals nor is she aware of whether or not any non-Caucasian nurse has been positively or negatively appraised on communication skills. In

4

addition, Martel chose not to file a rebuttal to her six-month performance appraisal although she understood at the time that this was an option.

From August 2008 until early November 2008 Acosta was assigned to supervise Martel. According to Rodriquez and Acosta, the purpose of the assignment was to give Acosta the opportunity to assume a greater supervisory role. Martel testified at her deposition that she did not know the reason why her supervision was changed from Rodriguez to Acosta, but she believed the change may have been an act of retaliation for her complaint about Gilling.

In September 2008 Acosta learned that one of the per diem nurses Martel was using for some visits was at his maximum number of daily patient visits allowed under the defendant's policy, which was twenty-five visits per day.  Nystrom, NEHC's president, had established this policy to ensure that each patient is given ample time to receive an appropriate level of care and to comply with state and federal billing requirements. On September 26, 2008, Acosta called Martel to request that she use a different per diem nurse with a lower number of daily visits.

On or about October 17, 2008, Nystrom asked Rodriquez to address what Nystrom viewed as an ongoing issue with Martel exceeding the maximum daily number of visits allowed by NEHC's patient visit policy, i.e., twenty- five visits. At her deposition, the plaintiff testified that "if I was going over the 25, it may have been around 30 visits [p]er day, not individuals but visits." (Doc. # 21-3, at 32, p. 121: 12-14). She further testified that during this time period she "was consistently asking for help with decreasing my caseload and not getting any help or feedback." (Id. at 32, p. 120:22-24). Rodriguez spoke with Acosta, who was then Martel's supervisor, and it was determined that Acosta would follow up with the plaintiff concerning this issue. Acosta then discussed the matter with Oronzo and they decided to give Martel a verbal counseling regarding the issue of exceeding the allowable number of daily visits and to prepare a

5

clinical performance action plan to reduce the number of the plaintiff's evening visits. On October 24, 2008, Acosta telephoned Martel to explain the verbal warning and the clinical performance action plan. Martel acknowledges that she "raised my voice once during the conversation [with Acosta] in emphasis of a sentence, and when C. Acosta addressed that concern I immediately apologized and resumed a normal tone of voice." (Id. at 34, pp. 128:24-25, 129:1-2). Martel told Acosta that her caseload was too high and that she would be forced to resign if a plan to address her caseload could not be worked out.

Following her conversation with Acosta, Martel had another phone conversation that same afternoon with Knapp, Rodriquez and Donna LaFountain ("LaFountain"), human resources administrator. The purpose of the call was to discuss Martel's conduct when she spoke to Acosta earlier in the day, as well as the policy concerning the maximum daily visits. According to Knapp and Rodriquez, the plaintiff expressed her displeasure with her supervisors. She also stated that Knapp had not resolved the issues raised by Martel at a prior meeting. The issues that had been previously raised by Martel were performing the daily number of visits she felt appropriate and determining the makeup of her patient caseload without any interference from her supervisors. At the end of this conversation Martel inquired about a transfer to NEHC's West Hartford branch.

The plaintiff subsequently submitted a written request to transfer to the West Hartford branch. Knapp initially told Martel that her transfer request was approved. Knapp later learned, however, that the transfer request had been denied by Nystrom, who must approve all such requests. Nystrom made the decision to deny the request on her own.

On November 4, 2008, Oronzo and Rodriquez met with Martel and informed her that she had been issued a written Warning and Performance Improvement Needed Notice ("Warning")

on the basis of her insubordination and argumentative behavior during the two October 24th phone calls. Martel refused to sign the Warning and requested an immediate personal leave of absence, which was granted. Rodriguez then asked Acosta to cover Martel's patients beginning on November 5, 2008.

On the morning of November 5, 2008, Acosta visited approximately ten of Martel's patients whose medication had been pre-poured for the entire week.  In addition, Acosta found empty medicine bottles along with the pre-poured medications for six of the ten patients. Because the bottles were empty, Acosta had to call a pharmacy to request the manufacturers' pill descriptions in order to verify the medications before administering them. One of the plaintiff's patients was not at the address listed in the chart and Acosta had to drive around Hartford to find the patient, who had moved in with her mother. Another patient who was not at home for his scheduled visit had taken an emergency dose of the medication Martel had pre-poured for him. A patient with a pacemaker told Acosta that Martel checked her blood pressure and heart rate only every now and then. Acosta reported her findings to Knapp, Rodriguez, and Oronzo.

 On November 7, 2008, Oronzo, Knapp, Rodriquez and LaFountain met with the plaintiff. At that meeting, Martel acknowledged her understanding of the NEHC policy on pre-pouring medication. When asked why she had been pre-pouring medication knowing it was against company policy, she responded that it was more convenient for her to do so. Oronzo then told Martel that as a result of her admission that she was pre-pouring medications in violation of company policy, she would be suspended from employment until such time as NEHC completed a review of her patients' records.

On November 17, 2008, Rodriquez and Oronzo met with Martel and provided her with a second written Warning and Performance Improvement Needed Notice ("second Warning") that

was based on the information reported by Acosta on November 5th and the preliminary findings of the audit review of patients' records. The reasons for the second Warning were listed as: "Violation of Medication Administration Policy," "Failure to follow-up with regard to POC [plan of care]," and "Failure to recognize visit frequency with clinical presentation of the patient." (Doc. #21-2, at 41).  The second Warning went on to inform Martel that she was suspended from employment for a period of ten days (from November 10, 2008, through November 21, 2008) and would be subject to a corrective action plan for a period of six months. This plan provided for a weekly review of the plaintiff's nursing practice, limitations on the number of days per week she was permitted to work, close monitoring of the volume of her daily visits, and in-office case conferences at least twice a week.

On November 28, 2008, Martel wrote a letter to Oronzo in response to the second Warning. With regard to the issue of pre-pouring medications, the plaintiff stated that "although I was aware that pre-pouring medications was against agency policy, I believed that it was a safe, acceptable practice, as it is a common practice, including by Supervisor, E. Rodriguez." (Doc. #24-3, at 6). She went on to advise Oronzo that she had witnessed non-Caucasian nurses, including Rodriguez, Gilling, and  A.Valazquez, routinely pre-pouring medications without repercussion, and believed she was being discriminated against in favor of "Spanish Nurses" by her supervisors. (Id. at 6-7). Martel also asserted that the other two reasons stated for the issuance of the second Warning were inaccurate and went on to address the issues that had been raised on the basis of the review of patients' records.

In an affidavit filed in support of the defendant's summary judgment motion, Acosta attests to the fact that she has taken disciplinary action against several non-Caucasian nurses, including Hispanic per diem nurse Ana Valazquez, for pre-pouring medications. (Doc. # 21-2, at

8

87, ¶ 20). Oronzo similarly swears that he was personally involved in the discipline of three non-Caucasian nurses for pre-pouring medications, two of whom received Warning and Performance Improvement Notices and were suspended, and a third who was placed on a clinical action plan. (Doc. #27-1, at 2-3,  ¶¶ 4,5).Vivian Eison, an African- American nurse, attested to the fact that she had received a written warning and a ten day suspension for, among other things, pre-pouring medications in violation of NEHC's policy. (Id. at 14, ¶ 5).

 On December 1, 2008, Knapp and Oronzo, with the support of Nystrom, met with Martel and told her that based on the findings of the completed audit review, NEHC had determined that she would benefit from medical retraining and she was being temporarily reassigned to the defendant's medical division for that purpose. Oronzo told Martel she would be transferred back to the behavioral division once she successfully completed her retraining. The plaintiff's salary and other benefits would remain the same during the transfer period, and Oronzo agreed to work with her in an effort to allow her to conduct extra visits on the weekend to supplement her salary. This was not the first time Oronzo had required a behavioral health nurse to team with a medical nurse for retraining purposes.

Following Martel's December 1, 2008 transfer to the medical division, Knapp assumed supervisory responsibility for her. On December 5, 2008, Nystrom held an impromptu meeting with Martel and Knapp. Nystrom told Martel that if she worked through the plan of correction successfully, Nystrom would reconsider her request to transfer to the West Hartford office.

On December 11, 2008, Martel approached Nystrom and indicated that she would like to attend a medical admission visit with a particular nurse before seeing medical patients independently. Nystrom then asked Knapp whether the plaintiff could "shadow," i.e., follow, a specific supervisor for an admission that day. Knapp agreed and arranged for Martel to attend an

admission visit with that supervisor. When Nystrom asked Martel if she was comfortable with this resolution, she indicated that she felt much better.

After Martel had attended an admission visit on December 11, 2008, with the supervisor she had requested, Knapp requested that the plaintiff follow-up with that patient independently the next day. Martel refused to see the patient independently, stating that she felt uncomfortable case managing a medical client when she had never conducted a full medical visit on her own and she was also concerned about a language barrier with the patient. On December 12, 2008, Nystrom and Oronzo met to discuss Martel's refusal to independently follow-up with the medical patient who had received an admission visit the previous day. At that time Nystrom decided to terminate Martel's employment and requested that Oronzo effectuate the termination that day. Oronzo met with Martel later that day and told her that her employment had been terminated due to her refusal of a request to do an independent visit and in light of her disciplinary history.

## II. DISCUSSION

The plaintiff brings this action pursuant to Title VII and CFEPA. The Complaint sets forth the following claims: (1) employment-related race discrimination and (2) retaliation for prior complaints of unlawful discrimination. The basis for the plaintiff's claims of discrimination includes the events leading to her December 12, 2008 termination. The defendant asserts that summary judgment is warranted because (1) the undisputed evidence establishes that the defendant based its decisions concerning the plaintiff's employment on legitimate, non-discriminatory and non-retaliatory reasons, and (2) the plaintiff cannot show that the defendant's reasons were false and that the real reason behind the adverse employment actions against the plaintiff was intentional discrimination.

A. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party bears the burden to demonstrate "the absence of any material factual issue genuinely in dispute." American International Group, Inc. v. London American International Corp., 664 F.2d 348, 351 (2d Cir. 1981) (internal quotation marks omitted).

On a motion for summary judgment, the Court must therefore determine "whether, as to any material issue, a genuine factual dispute exists." Kaytor v. Electric Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010). A dispute concerning a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Williams v. Utica College of Syracuse University, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks omitted). A fact is material if it "'might affect the outcome of the suit under the governing law.'" Bouboulis v. Transport Workers Union of America, 442 F.3d 55, 59 (2d Cir. 2006) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)).

In making these determinations, "the court must review the record taken as a whole." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000) (internal quotation marks omitted). In doing so, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Id. Nonetheless, "'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the

plaintiff.'" <u>Lunts v. Rochester City School District</u>, 515 F. App'x 11, 13 (2d Cir. 2013) (quoting <u>Anderson</u>, 477 U.S. at 252). The nonmoving party may not "rely on conclusory allegations or unsubstantiated speculation to defeat a motion for summary judgment." <u>Id.</u> (internal quotation marks omitted).

Because direct evidence of discrimination is seldom available with respect to an employer's mental processes, plaintiffs in employment discrimination suits often must rely on the cumulative weight of circumstantial evidence. <u>Carlton v. Mystic Transportation, Inc.</u>, 202 F.3d 129, 135 (2d Cir. 2000). Courts should take caution before exercising the power of summary judgment in fact-intensive discrimination cases, especially when discriminatory intent and state of mind are in dispute. <u>Id.</u> at 134. However, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir. 2001).

## B. RACIAL DISCRIMINATION CLAIM

Martel alleges that she was subjected to adverse employment actions, including verbal and written warnings, a ten-day suspension, relocation to the defendant's medical division, and termination, because of her race. Title VII provides that it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color . . . ." 42 U.S.C. § 2000e-2(a). Similarly, CFEPA prohibits employers from "discharg[ing] from employment any individual or . . . discriminat[ing] against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race [or] color . . . ." Conn. Gen. Stat. § 46a-60(a)(1). "Connecticut courts look to federal discrimination law for guidance in determining liability under CFEPA. Specifically, they apply

the standards set forth by the Supreme Court in McDonnell Douglas[ Corp. v. Green, 411 U.S.

792 (1973)] . . . ." Proctor v. MCI Communications Corp., 19 F. Supp. 2d 11, 14 n.1 (D. Conn.

1998) (citation omitted).

The McDonnell Douglas three-part burden-shifting test must be satisfied in order to

sustain a claim of discrimination based on race pursuant to Title VII. St. Mary's Honor Center v.

Hicks, 509 U.S. 502, 506 (1993); see also Texas Department of Community Affairs v. Burdine,

450 U.S. 248, 252-53 (1981). First, the plaintiff has the burden of proving by a preponderance of

the evidence a prima facie case of discrimination. Hicks, 509 U.S. at 506. Second, if the plaintiff

succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate some

legitimate, nondiscriminatory reason for the adverse employment action. Id. at 507. Third,

should the defendant meet its burden of production, the plaintiff must then have an opportunity

to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant

were not its true reasons, but were instead a pretext for discrimination. Id. at 507-08.

i. Prima Facie Case

In order to establish a prima facie case of discrimination in violation of Title VII, a

plaintiff must show: "(i) membership in a protected class; (ii) qualifications for the position; (iii)

an adverse employment action; and (iv) circumstances surrounding that action giving rise to an

inference of discrimination." Collins v. N.Y. City Transit Authority, 305 F.3d 113, 118 (2d Cir.

2002). With respect to establishing a prima facie case, the burden a plaintiff carries to survive a

summary judgment motion is de minimis. See Cronin v. Aetna Life Insurance Co., 46 F.3d 196,

203-04 (2d Cir. 1995).

Martel clearly satisfies the first three requirements of a prima facie case. As to the first

element, the plaintiff was a member of a protected group within the meaning of Title VII as she

asserts that, as a Caucasian, she was discriminated against on the basis of her race. <u>See</u>
<u>McDonald v. Santa Fe Trail Transportation Co.</u>, 427 U.S. 273, 280 (1976) (holding that "Title
VII prohibits racial discrimination against . . . white petitioners").

In order to be considered "qualified for the position," the plaintiff must show only that
she "possesses the basic skills necessary for performance of [the] job." <u>Slattery v. Swiss</u>
<u>Reinsurance America Corp.</u>, 248 F.3d 87, 92 (2d Cir. 2001) (internal quotation marks omitted).
There is no dispute that Martel was qualified for the position of a primary care registered nurse,
as she had over twenty years of experience in nursing, the last seven of which were as a
registered nurse.

As to the third element of a prima facie case, an "adverse employment action" is one that
is "more disruptive than a mere inconvenience or an alteration of job responsibilities." <u>Terry v.</u>
<u>Ashcroft</u>, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotation marks omitted). Actions that
constitute a materially adverse change include "termination of employment, a demotion
evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,
significantly diminished material responsibilities, or other indices . . . unique to a particular
situation." <u>Id.</u> (internal quotation marks omitted).

Throughout her period of employment at NEHC, Martel received a performance
appraisal, verbal counseling, two written warnings, a ten-day suspension, a transfer to the
medical department, and notice of termination on December 12, 2008. Her termination
undoubtedly constitutes a materially adverse change. Similarly, the plaintiff's ten-day suspension
constitutes a materially adverse change because it represents a temporary deprivation of pay. <u>See</u>
<u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 548 U.S. 53, 72-73 (2006) ( a 37-day
suspension was materially adverse, as a month without pay would be a serious hardship for most

14

reasonable employees). However, the performance appraisal, verbal counseling, and two warnings do not constitute adverse employment actions, as they did not significantly alter the terms and conditions of Martel's employment. See Sanders v. New York City Human Resources Administration, 361 F.3d 749, 756 (2d Cir. 2004) (a performance evaluation does not, on its own, constitute a materially adverse action by an employer); see also Weeks v. New York State (Div. of Parole), 273 F.3d 76, 86 (2d Cir. 2001) (concluding that a "notice of discipline" and a "counseling memo" by themselves were insufficient to constitute an adverse employment action). Likewise, the plaintiff's temporary reassignment to the defendant's medical division is not a materially adverse change as it was "a mere . . . alteration of job responsibilities." Terry, 336 F.3d at 138 (internal quotation marks omitted). During that period Martel received the same salary and benefits and was still allowed to conduct extra visits on the weekend to supplement her salary.

        To complete her prima facie case, Martel must introduce evidence that the adverse employment actions against her were taken under circumstances that give rise to an inference of unlawful discrimination. A plaintiff may raise such an inference by showing that the employer subjected her to disparate treatment by treating her "less favorably than a similarly situated employee outside [her] protected group." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).  In order to make such a showing, the plaintiff must compare herself to employees who are "similarly situated in all material respects." Norville v. Staten Island University Hospital, 196 F.3d 89, 95 (2d Cir. 1999) (internal quotation marks omitted). In order for employees to be "similarly situated in all material respects," there should be an "objectively identifiable basis for comparability." Graham, 230 F.3d at 40. (internal quotation marks omitted). While the circumstances of other employees need not be identical to those of a plaintiff seeking an

15

inference of discrimination, "there should be a reasonably close resemblance of facts and circumstances." Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001). Courts should make an independent determination of comparable conduct based on the facts and circumstances relevant to each case. Graham, 230 F.3d at 40.

The plaintiff's allegations do not meet the "similarly situated in all material respects" standard, as she has failed to present evidence such that a reasonable jury could find that a similarly situated employee outside of her protected group engaged in comparable conduct but did not undergo disciplinary action. Martel alleges that at least two other similarly situated employees, Gilling and Valazquez, were treated more favorably and that, in general, non-Caucasian nurses were not reprimanded for committing the same acts as she did. Specifically, she argues that her six-month performance appraisal reflected the racial bias of her supervisor, Rodriquez. However, Martel does not name a similarly situated employee outside of her protected group who received a more favorable performance appraisal and admits that she has never reviewed other nurses' performance appraisals nor is she aware of whether or not any non-Caucasian nurse has been positively or negatively appraised on communication skills. Her vague testimony that she personally observed "a difference in treatment" is not sufficient evidence to give rise to an inference of discrimination.

Martel further contends that other nurses had a caseload of only twelve patients while Acosta expected her to handle a caseload of twenty-five patients. However, she has provided no evidence as to the caseload of any similarly situated non-Caucasian nurses. Her mere contention that such is the case is not sufficient to warrant an inference of discrimination.

Martel further asserts that non-Caucasian nurses were routinely pre-pouring medications without punishment, while she was disciplined for the same conduct due to her race. NEHC's Local Rule 56(a)(1) Statement contains the following factual assertion:

> Acosta and Rodriguez have . . . disciplined Hispanic and African-American nurses for violating the same pre-pouring policy that Martel was disciplined for violating. Contrary to Martel's belief, Ana Valazquez, a Hispanic nurse, was suspended for one week for violating pre-pouring policy.

(Doc. # 21-7, at 33, ¶ 98).  The defendant's factual assertion as to the discipline of non-Caucasian nurses is followed by specific citations to the affidavits of Rodriguez and Acosta. NEHC subsequently filed an affidavit from Vivian Eison in which she attests to the fact that she is an African-American nurse employed by NEHC and that she received a written warning and ten day suspension in February 2008 for, among other things, violating the NEHC pre-pouring policy. (Doc. # 27-1, at 14, ¶ 5).

In her Local Rule 56(a)(2) Statement, Martel denies NEHC's factual assertion concerning the discipline of non-Caucasian nurses. The Local Rules require a "specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." L. Civ. R. 56(a)(3). The plaintiff cites to two pages of her deposition transcript. In that portion of the transcript Martel testified as follows:

> [T]here is a per diem nurse, Anna Velazquez who she sent in there to see Patients A and B, who also had pre-poured medications for Monday to Friday for her evening visits. And I indicated that in one of my meetings with John and Elizabeth, but Elizabeth just said, "Oh, you didn't pre-pour those?" And I said, "No. I wouldn't pre-pour medications for another nurse to give." And that just seems to not be an issue. It's okay for her but not for me.

(Doc. # 21-4, at 11, pp. 219:19-25, 220:1-3). Although not cited in the plaintiff's Local Rule 56(a)(2) Statement, an exhibit submitted by Martel to the Connecticut Commission on Human Rights and Opportunities ("CHRO") also addresses this point. In this exhibit, which is a copy of a letter to Oronzo dated November 6, 2008, Martel states the following:

> Since I had observed on Nov. 4, 2008 that per-diem Nurse, A. Velazquez, had pre-poured evening/bedtime medications for 4 days (Nov. 4, 08 – Nov. 7, 08), for these same patients, I questioned why I was the only Nurse being reported/investigated. E. Rodriguez responded with the question, "you didn't pre-pour those medications"?, to which I stated, "no." E. Rodriguez stated, "that's news." J. Oronzo informed me that he was not at liberty to discuss other investigations.

(Doc. # 24-3, at 6-7).

The Court recognizes that "the weighing of the evidence is a matter for the factfinder at trial, not for a court considering a motion for summary judgment." Jea Keng Kang v. Hertz Vehicles LLC, 397 F. App'x 664, 666 (2d Cir. 2010) (internal quotation marks omitted). At the same time, however, "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment . . . ." Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009) (internal quotation marks omitted). "'A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.' Statements not based on personal knowledge must be disregarded." Kephart v. Data Systems International, Inc., 243 F. Supp. 2d 1205, 1209 (D. Kan. 2003) (quoting Fed. R. Evid. 602).

In Reilly v. City of West Haven, Civil Action No. 3:02cv1346 (SRU), 2005 U.S. Dist. LEXIS 10338 (D. Conn. March 31, 2005), one of the plaintiff's claims was that the Mayor of the City of West Haven retaliated against him by altering the requirements of various positions with the City which the plaintiff tried to obtain after his own position had been eliminated. The

plaintiff's position as the City's electrical inspector was eliminated after he had supported a

political opponent of the incumbent mayor. In opposing the defendants' motion for summary

judgment, the plaintiff Reilly cited "his own affidavit, his own deposition testimony, and a letter

he wrote to a member of the City Council to buttress his claim that the Mayor's actions were

retaliatory." Id. at *11. The court concluded that Reilly had failed to produce probative evidence

sufficient to demonstrate a genuine dispute as to a material fact:

> The problem is that these documents only contain statements concerning
> Reilly's beliefs about what occurred after his position was eliminated.
> Reilly's beliefs that Mayor Borer acted to prevent him from obtaining
> a job are insufficient to establish a genuine issue of material fact.
> There is no other evidence to support Reilly's claim.

Id.

The Court finds that, similar to the circumstances in Reilly, the documents upon which

the plaintiff relies in opposing the defendant's factual assertion that non-Caucasian nurses were

disciplined for violating the NEHC pre-pouring policy fail to present probative evidence

sufficient to establish a genuine issue of material fact. The plaintiff's evidence clearly reflects

her beliefs, but falls short of being sufficient to support a finding that the witness has personal

knowledge of the matter. See Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir.

1993) (a party opposing summary judgment "may not rely simply on conclusory statements or on

contentions that the affidavits supporting the motion are not credible"). Martel's deposition

testimony that "[pre-pouring by a non-Caucasian nurse] just seems to not be an issue," and her

affidavit to the CHRO indicating that "Oronzo informed me that he was not at liberty to discuss

other investigations" are not sufficient to support a finding that she has personal knowledge of

whether or not non-Caucasian nurses were disciplined for violating the pre-pouring policy.

Consequently she has not shown that she is competent to testify on that matter and, as a result,

her testimony is insufficient to create a genuine dispute of material fact on that subject. See Aurel v. School Board of Miami-Dade County Public Schools, 261 F. Supp. 2d 1375, 1378 (S.D. Fla. 2003) (the plaintiff, who alleged that employees of a different race were not disciplined for drinking on the job "failed to show he has personal competence regarding . . . the alleged employees who were found drinking on the job . . ., particularly with regard to the disciplinary action that may have been taken").

Although a plaintiff's burden of establishing a prima facie case in the context of employment discrimination law is minimal, Martel has not met this low threshold. Because the plaintiff has not produced sufficient evidence to show that the defendant treated her "less favorably than a similarly situated employee outside [her] protected group"; Graham, 230 F.3d at 39; the Court concludes that she has not established a prima facie case of race discrimination.

ii. Evidence of Non-Discriminatory Reason

Even if the plaintiff had established a prima facie case of discrimination based on race under Title VII and CFEPA, summary judgment would still be appropriate in this case. The second element of the McDonnell Douglas test shifts the burden to the defendant to produce evidence that the adverse employment action was taken for a legitimate non-discriminatory reason. The burden at this stage "is one of production, not persuasion; it can involve no credibility assessment." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000) (internal quotation marks omitted). "The defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993) (internal quotation marks omitted). However, "'the ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Id. (quoting Burdine, 450 U.S. at 253). If the defendant succeeds in producing admissible evidence of a legitimate, non-discriminatory reason, the presumption raised by the prima facie case is rebutted and drops out of the case. Id.  "The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff". Burdine, 450 U.S. at 254 (citation omitted).

The defendant produced sufficient admissible evidence to support a finding that unlawful discrimination was not the cause of the adverse employment actions taken against Martel. On November 5, 2008, Acosta discovered that approximately ten of Martel's patients had their medication pre-poured for the entire week. The plaintiff was aware of NEHC's pre-pouring policy, as Nystrom had personally trained her on that subject in March 2008. When confronted, Martel admitted that she had pre-poured the medication for her convenience in violation of NEHC's policy.

Based on Acosta's November 5, 2008 report, the preliminary finding of an audit review of Martel's patients, and the plaintiff's own admission of pre-pouring, Rodriquez and Oronzo issued a second written Warning and Performance Improvement Needed Notice to the plaintiff and placed her on a ten-day suspension and six-month corrective action plan. The reasons for the second Warning were listed as: "Violation of Medication Administration Policy," "Failure to follow-up with regard to POC [plan of care]," and "Failure to recognize visit frequency with clinical presentation of the patient." (Doc. #21-2, at 41).  The defendant has produced sufficient documentation to raise a genuine issue of fact as to whether it discriminated against the plaintiff.

On December 11, 2008, after she had been transferred to the defendant's medical division, Martel accompanied a supervisor on a patient's admission visit. Knapp requested that Martel follow-up independently with that patient the next day. Martel refused to see the patient independently, stating that she felt uncomfortable case-managing a medical client when she had never conducted a full medical visit on her own, and she was also concerned about a language barrier with the patient. On December 12, 2008, Martel was informed that her employment had been terminated due to her refusal of a request to do an independent visit and in light of her disciplinary history. The Court finds that the defendant has set forth admissible evidence that could support a finding that racial discrimination was not the cause of the adverse employment actions taken against Martel by the defendant.

    iii. Pretext for Discrimination

Once the employer articulates a nondiscriminatory reason for the decision not to hire the plaintiff and the prima facie case is rebutted, the plaintiff must then have a full and fair opportunity to "'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Hicks, 509 U.S. at 515 (quoting Burdine, 450 U.S. at 253). "[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." Id. Thus, the plaintiff retains "'the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" Id. at 516-17 (quoting Burdine, 450 U.S. at 256). The factfinder must not only disbelieve the employer, but must believe the plaintiff's explanation of intentional discrimination. Id. at 519.

The trier of fact may consider the evidence establishing the plaintiff's prima facie case, and inferences properly drawn therefrom, when deciding whether the defendant's explanation is

pretextual. <u>Reeves</u>, 530 U.S. at 143. However, a record that includes evidence of a prima facie

case and evidence permitting a finding of pretext may not always suffice to permit a finding of

discrimination. <u>Zimmermann v. Associates First Capital Corp.</u>, 251 F.3d 376, 382 (2d Cir. 2001);

<u>See</u> <u>Slattery v. Swiss Reinsurance America Corp.</u>, 248 F.3d 87, 94 (2d Cir. 2001) (even

assuming a jury could find the reason articulated by the defendant for the plaintiff's termination

to be pretextual, the plaintiff failed to present sufficient evidence to permit a jury to find that the

real reason for his termination was age discrimination). The Court must "examine the entire

record and, in accordance with <u>Reeves</u>, make the case-specific assessment as to whether a

finding of discrimination may reasonably be made." <u>Zimmermann</u>, 251 F.3d at 382.

Martel contends that the defendant suspended her and terminated her employment on the

basis of her race. With regard to the claim that she violated NEHC's pre-pouring policy, Martel

argues that even though she admitted to pre-pouring medication herself, she had witnessed non-

Caucasian nurses pre-pouring medications without consequences. The evidence Martel cites in

support of this contention is her own statement that the pre-pouring of medication by a non-

Caucasian nurse "just seems to not be an issue. It's okay for her but not for me,"   (Doc. # 21-4,

at 11, pp. 219:19-25, 220:1-3). However, her mere belief that she was the only nurse disciplined

is not sufficient probative evidence to show a pretext of discrimination. The plaintiff's

conclusory statement stands in stark contrast to the evidence produced by the defendant

supporting a finding that non-Caucasian nurses were disciplined for violating NEHC's pre-

pouring policy. That evidence includes an affidavit from a non-Caucasian nurse attesting to the

fact that she was disciplined for violating the pre-pouring policy.

Martel also acknowledges that she refused to conduct an independent patient visit

following her transfer to the medical unit. She was informed that her termination was based on

that refusal, along with her history of discipline. Martel has offered reasons why she refused to conduct the requested independent visit, i.e, she felt uncomfortable case managing a medical client when she had never conducted a full medical visit on her own and she was concerned about a language barrier with the patient. She has not, however, provided sufficient evidence to support a finding that the real reason for her termination was race discrimination. Martel cannot satisfy the third element of the McDonnell-Douglas test, i.e., demonstrating that the legitimate reasons offered by the defendant were not its true reasons, but were instead a pretext for discrimination. For this additional reason, the Court finds that the defendant is entitled to summary judgment on the plaintiff's claim of racial discrimination.

C. RETALIATION CLAIM

The plaintiff alleges that she was retaliated against by her supervisors because she had made complaints of unlawful racial discrimination. Title VII prohibits retaliation against an individual "because he [or she] has opposed any practice made an unlawful employment practice by [Title VII] . . . ." 42 U.S.C. § 2000e-3(a). Likewise, CFEPA prohibits employers from discharging or otherwise discriminating against any person "because such person has opposed any discriminatory employment practice . . . ." Conn. Gen. Stat. § 46a-60(a)(4). "CFEPA retaliation claims . . . are analyzed in the same manner as Title VII retaliation claims." Vasquez v. Claire's Accessories, Inc., 392 F. Supp. 2d 342, 354 (D. Conn. 2005). Retaliation claims brought pursuant to Title VII use the McDonnell Douglas burden-shifting framework. See Terry v. Ashcroft, 336 F.3d 128, 141(2d Cir. 2003). Title VII's anti-retaliation provision, which is broader in scope than that of its discriminatory action provision, covers an employer's actions that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 57 (2006).

i. Prima Facie Case

In order to establish a prima facie case of retaliation, a plaintiff must show that: "(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 608 (2d Cir. 2006).  The plaintiff's burden at this stage is slight, and a prima facie case may be established with *de minimis* evidence. Wanamaker v. Columbian Rope Co., 108 F.3d 462, 465 (2d Cir. 1997).

As to the first element of the prima facie case, the protection against retaliation under Title VII extends to "informal protests of discriminatory employment practices, including making complaints to management . . . ." Sumner v. United States Postal Service., 899 F.2d 203, 209 (2d Cir. 1990) However, informal employee complaints only constitute a protected activity if the employee alleges "some form of discrimination prohibited by Title VII." Williams v. Home Depot U.S.A., Inc., No. 02 Civ. 5353 (DAB), 2005 U.S. Dist. LEXIS 22254, at *44 (S.D.N.Y. Sept. 30, 2005). Complaints that are "vague and ambiguous and do not sufficiently articulate the nature of the harassment do not constitute a protected activity." Miller v. Edward Jones & Co., 355 F. Supp. 2d 629, 643 (D. Conn. 2005). A plaintiff is not required to prove the merit of her underlying complaint to establish that her activity is protected, but only that she acted under a reasonable belief that a Title VII violation existed. Sumner, 899 F.2d at 209.

The one complaint identified by the plaintiff which satisfies the requirements of a protected activity, i.e., a complaint of discrimination prohibited by Title VII, was her November 28, 2008 communication to Oronzo in which she stated that "I believe I am being discriminated

25

against, in favor of Spanish Nurses, since both of my Supervisors are Spanish. They seem to be protecting a Spanish Nurse while implicating myself for violating a [pre-pouring] policy on the very same day & with the same clients in question." (Doc. #24-3, at 7).

In order to satisfy the second element of the prima facie case, nothing more is necessary than "general corporate knowledge that the plaintiff has engaged in a protected activity." Patane v. Clark, 508 F.3d 106, 115 (2d Cir. 2007) (internal quotation marks omitted). In this case, Martel wrote a letter to Oronzo, director of human resources, who was in a position to hand over the complaint to someone who could investigate the plaintiff's claims. Thus, there was general corporate knowledge of the plaintiff's complaint which satisfies the second element of the prima facie case. See Patane, 508 F.3d at 115 (the plaintiff pled facts showing that the defendant university was aware of her protected activity, "since she alleges that she complained directly to a university employee"). The adverse employment action taken against Martel after she made her November 28, 2008 complaint to Oronzo was her termination on December 12, 2008.[1] Martel's termination satisfies the third element of the prima facie case.

"The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prim facie case of retaliation under Title VII . . . ." El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010).  In El Sayed, the Second Circuit concluded that the plaintiff "arguably established a prima facie case of retaliation under Title VII" on the basis of his termination approximately three weeks after he had complained to management about a discriminatory employment practice. Id. at 932.  Martel was terminated two weeks after she made her complaint of racial discrimination. For purposes of ruling on the defendant's motion

---

[1] Martel's ten day suspension preceded her November 28, 2008 discrimination complaint and the Court previously determined that her temporary reassignment to the defendant's medical division did not constitute an adverse employment action for purposes of Title VII.

for summary judgment, the Court will assume *arguendo* that the plaintiff has met her minimal burden of establishing a prima facie case of retaliation.[2]

ii. Evidence of Non-Discriminatory Reason

The second requirement of the McDonnell Douglas test shifts the burden to the defendant to "point[] to evidence of a legitimate, nonretaliatory reason for the challenged employment decision . . . ." Cifra v. General Electric Co., 252 F.3d 205, 216 (2d Cir. 2001). As noted in connection with the plaintiff's racial discrimination claim, on December 12, 2008, Martel was informed that her employment had been terminated due to her refusal of a request to do an independent visit and in light of her disciplinary history. While Martel has offered reasons why she believed it was appropriate for her to refuse to do the requested independent visit, she acknowledges that she did refuse that request. The defendant clearly has "point[ed] to evidence of a legitimate, nonretaliatory reason for the challenged employment decision . . . ." Id.

iii. Pretext for Discrimination

Since the defendant has articulated a non-retaliatory reason for Martel's termination, "the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretext for retaliation and that, more generally, the plaintiff's 'protected activity was a but-for cause of the alleged adverse action by the employer.'" Sanderson v. New York State Electric & Gas Corp., No. 13-1603-cv, 2014 U.S. App. LEXIS 5832, at *15 (2d Cir. March 27, 2014) (quoting University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517, 2534 (2013)). In that regard, the Court notes that "without more, . . . temporal proximity is insufficient to satisfy

---

[2] The defendant argues that Martel cannot rely on temporal proximity to satisfy the fourth element of the prima facie case because "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity . . . ." Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95 (2d Cir. 2001). In Slattery, the court specifically noted that "an extensive period of progressive discipline" began "a full *five months prior* to [the plaintiff's] filing of . . . charges." Id. Here the initial verbal counseling of Martel took place only one month prior to her complaining to Oronzo about racial discrimination. The Court views this as a significant distinction from the facts before the court in Slattery.

[a plaintiff's] burden to bring forward some evidence of pretext. Indeed, a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact." El Sayed, 627 F.3d at 933 (citations omitted). As was the case with her claim of racial discrimination, Martel has failed to produce any probative evidence that would support a finding that the defendant's proffered reason for her termination was a pretext for retaliation. Consequently, she has not met her burden under McDonnell Douglas and the defendant is entitled to summary judgment as to the plaintiff's retaliation claim.

### III. CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment (**doc. # 21**) is **GRANTED**. The Clerk is directed to close this case.

So ORDERED this    22nd    day of July, 2014.

_____/s/ DJS_____
DOMINIC J. SQUATRITO
UNITED STATES DISTRICT JUDGE